**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

| | |
|---|---|
| LAD (AVIATION), INC. d/b/a CHARLES TAYLOR ADJUSTING, | Case No. 3:24-cv-21-HTW-LGI |
| 5868 Westheimer Road, 1A, Box 511, Houston, Texas 77057 | |
| Plaintiff, | **VERIFIED COMPLAINT** |
| -against- | **(Jury Trial Demanded)** |
| RICHARD BOOKER, | |
| 138 Northern Pine Drive Canton, MS 39046 | |
| JUSTIN SHROYER | |
| 467 Sharon Road Canton, MS 39046 | |
| JAMES WILLIAMS | |
| 321 West Chippewa Street Brookhaven, MS 39601 | |
| STEPHANIE ROWLAND PATRICK | |
| 372 Eldorado Lake Drive Pearl, MS 39208 | |
| PAMELA MILLER | |
| 161 Oak Grove Drive Brandon, MS 39047 | |
| -and- | |
| CRAWFORD & COMPANY, INC. | |
| 5335 Triangle Parkway Peachtree Corners, GA 30092 | |
| Defendants. | |

Plaintiff LAD (Aviation), Inc. d/b/a Charles Taylor Adjusting ("Charles Taylor" or the

"Company"), files this Complaint against its former employees, Defendants Richard Booker, Justin Shroyer, James Williams, Stephanie Rowland Patrick, and Pamela Miller (the "Former Employee Defendants"), and their current employer, Defendant Crawford & Company, Inc. ("Crawford") and avers as follows:

## INTRODUCTION

1.      The Individual Defendants were employed by Charles Taylor from the summer of 2021 until their mass resignation from the Company in November 2023.  At the time of their mass resignation, the Individual Defendants were key members of the Company's insurance adjusting business and were responsible for leading the Company's business operations in the State of Mississippi.

2.      During their employment with Charles Taylor, Defendant Booker was a Senior Executive General Adjuster, Defendant Shroyer was an Executive General Adjuster, and Defendant Williams was a General Adjuster.  In these roles, Defendants Booker, Shroyer, and Williams worked directly with – and were directly responsible for – Charles Taylor's relationships with clients, employees, and independent contractors in Mississippi and across the United States. But instead of managing those relationships for the Company's benefit, as they were required to do both by law and by the terms of their employment agreements, Defendants Booker, Shroyer, and Williams exploited Charles Taylor's business relationships, goodwill, and confidential information to illegally and improperly benefit their new employer, Defendant Crawford & Company.

3.      During their employment with Charles Taylor, Defendant Miller was the Office Manager for the Company's Mississippi office location and Defendant Patrick was the Mississippi office's Administrator.  In these roles, Defendants Miller and Patrick worked directly with Defendants Booker, Shroyer, and Williams, and were directly responsible for managing and

2

administering Charles Taylor's relationships with the clients serviced by Defendants Booker, Shroyer, Williams (and other Charles Taylor employees). To perform their duties, Defendants Miller and Patrick had direct access to – and regularly used – Charles Taylor's confidential, proprietary, and trade secret information. But instead of administering those client relationships and using the Company's confidential information for the Company's benefit, as they were also required to do both by law and by the terms of their employment agreements, Defendants Miller and Patrick directly assisted and aided Defendants Booker, Shroyer, and Williams in exploiting Charles Taylor's business relationships, goodwill, and confidential information for the illegal and improper benefit of Defendant Crawford & Company.

4.      Charles Taylor invested significantly in its Mississippi business, generally, and to support the Individual Defendants, significantly, during their employment. This investment included, but was not limited to, dedicating significant company resources to the Individual Defendants' business, hiring (and committing to hire) additional Mississippi-based adjusters to work with the Individual Defendants, and providing the Individual Defendants with access to the Company's substantial roster of clients and business contacts. Charles Taylor's senior executives communicated regularly with the Individual Defendants regarding these investments and the Company's strategic plan to further grow its business in Mississippi.

5.      In direct contrast to Charles Taylor's investment in them, the Individual Defendants, while still employed by Charles Taylor, and without informing Charles Taylor, all negotiated secretly with and accepted job offers to work for Crawford & Company in roles identical to their former positions with Charles Taylor. At the same time, and similarly without informing Charles Taylor, the Individual Defendants also negotiated secretly with Charles

Taylor's clients in an effort to transition those clients' business from Charles Taylor to Crawford & Company.

6.    Upon resigning from Charles Taylor, the Individual Defendants attempted intentionally to cover their tracks and keep Charles Taylor from learning of their improper actions by permanently deleting all information from their Company-owned devices, even though (as the Individual Defendants know) those devices and the information on the devices belonged to Charles Taylor.

7.    These blatant actions by the Individual Defendants not only breached their obligations to the Company as Charles Taylor employees, but also were clear and intentional violations of their restrictive covenant agreements with Charles Taylor.  Among other obligations, those agreements specifically prohibited the Individual Defendants from (1) competing with Charles Taylor both during their employment and for one year following their separations, (2) soliciting, employing, or retaining Charles Taylor's employees or independent contractors for the benefit of a competitor both during their employment and for one year following their separations, and (3) at any time, misappropriating Charles Taylor's confidential and proprietary information. Defendants Booker, Shroyer, and Williams further agreed to not solicit or perform services for Charles Taylor's clients for the benefit of a competitor both during their employment and for one year following their separations.

8.    Upon learning of the Individual Defendants' scheme, Charles Taylor promptly terminated their access to the Company's computer and information systems and demanded that the Individual Defendants cease and desist from their competitive activities.  Charles Taylor terminated Defendants Booker, Shroyer, and Williams's systems access immediately; the access

of Defendants Patrick and Miller was terminated shortly thereafter upon the conclusion of their employment.

9.      The Individual Defendants were, and remain, undeterred by their contractual and legal obligations to Charles Taylor.  To this day, the Individual Defendants continue to plow forward unabated with their plan to unlawfully compete with Charles Taylor and steal Charles Taylor's clients and confidential information, all for the benefit of Defendant Crawford & Company.

10.      Defendant Crawford & Company was at all times aware of the Individual Defendants' legal and contractual obligations to Charles Taylor.  Nevertheless, Defendant Crawford & Company actively aided, abetted, facilitated, and benefitted from – and continues to actively aid, abet, facilitate, and benefit from – the Individual Defendants' unlawful scheme.  To this day, Crawford & Company refuses to even acknowledge the legal and contractual obligations that the Individual Defendants owe to Charles Taylor.

11.      Because the Individual Defendants are continuing to actively violate their legal and contractual obligations to Charles Taylor, and Crawford & Company continues to actively interfere with those legal and contractual obligations, Charles Taylor now asks this Court to award the preliminary and permanent relief against the Individual Defendants and Crawford & Company for:

> (a)      Breach of the obligations contained in the Individual Defendants' restrictive covenants agreements with Charles Taylor;
>
> (b)      Tortious interference by Crawford & Company with the Individual Defendants' legal and contractual obligations to Charles Taylor;
>
> (c)      Tortious interference by Crawford & Company with Charles Taylor's business relations with current and prospective clients, customers, and business partners;
>
> (d)      Breach of the Individual Defendants' fiduciary duty and/or duty of loyalty owed to Charles Taylor;

(e)     Unfair competition by the Individual Defendants in violation of state law; and

(f)     Misappropriation of Charles Taylor's confidential information.

## PARTIES

12.     Plaintiff LAD (Aviation), Inc. d/b/a Charles Taylor Adjusting is a Texas corporation with its principal place of business in Connecticut, at 64 Danbury Road, Wilton, CT 06897.

13.     Defendant Richard Booker is an individual domiciled and resident in the State of Mississippi at 138 Northern Pine Drive, Canton, Mississippi 39046.

14.     Defendant Justin Shroyer is an individual domiciled and resident in the State of Mississippi at 467 Sharon Road, Canton, Mississippi 39046.

15.     Defendant James Williams is an individual domiciled and resident in the State of Mississippi at 321 West Chippewa Street, Brookhaven, Mississippi 39601.

16.     Defendant Pamela Miller is an individual domiciled and resident in the State of Mississippi at 161 Oak Grove Drive, Brandon, Mississippi 39047.

17.     Defendant Stephanie Rowland Patrick is an individual domiciled and resident in the State of Mississippi at 372 Eldorado Lake Drive, Pearl, Mississippi 39208.

18.     Defendant Crawford & Company is a Georgia corporation with a principal place of business at 5335 Triangle Parkway, Peachtree Corners, GA 30092.

## JURISDICTION AND VENUE

19.     This Court has diversity-based subject matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1332 because this is a dispute between citizens of different states and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

PD.44165668.1

20.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Charles Taylor's claims against the Individual Defendants and Crawford & Company occurred in this District.

## RELEVANT FACTS

### Industry Background

21.     Charles Taylor is a global leader in the insurance claim adjusting industry, with its claims adjusting services covering aviation, natural resources, marine, property, casualty, technical and special risks insurance claims.

22.     Charles Taylor focuses on commercial losses and insurance claims across all major lines and geographies, many of which are large-scale and complex in nature. The Company handles onshore and offshore energy claims, maritime casualties, aircraft losses, and specialist property and casualty claims for a variety of insurance companies to assist in determining whether claims should be paid and, if so, how much the insurance company should pay.

23.     The claims adjusting industry is highly competitive, and Charles Taylor invests heavily in maintaining a competitive advantage over its direct competitors (including Crawford & Company) by, among other steps, developing, and maintaining, goodwill through its relationships with current and prospective clients and business partners, and developing confidential business strategies.

24.     As a result, the protection of Charles Taylor's business goodwill and relationships, and its confidential and proprietary information, is critical to preventing competitors or would-be competitors (including Crawford & Company) from obtaining an unfair competitive advantage over the Company.

PD.44165668.1

**<u>Charles Taylor's Protection of Its Business Goodwill and Confidential Information</u>**

25.    In order to protect its investment, Charles Taylor requires that its employees agree – as a condition of employment with the Company – to restrictive covenants agreements that protect against the misappropriation, use, or disclosure of "Confidential Information."   The Company's restrictive covenant agreements are tailored to the positions held by its employees. Thus:

- The restrictive covenant agreements that Defendants Booker, Shroyer, and Williams accepted as a condition of their employment defined Charles Taylor's "Confidential Information" to include "information containing or concerning business strategies and opportunities, customers, prospective customers, current and prospective business partners, pricing practices, contracts, marketing and all other information that belongs to or relates to the Company and its business that is essential to the protection of the goodwill of the Company and/or any Affiliate and to the maintenance of their competitive position in the industry, and/or that the disclosure or improper use of which would be highly detrimental to the Company and/or any Affiliate,"; and

- The restrictive covenant agreements that Defendants Miller and Patrick accepted as a condition of their employment confirmed that Charles Taylor's "Confidential Information" included "all documents," "all work product generated by the Company," and "[a]ll lists, processes, and internal documents."

26.    The restrictive covenant agreements further protects Charles Taylor's goodwill and confidential information by (depending on an employee's position with the Company) prohibiting the solicitation of Charles Taylor's clients, suppliers, employees, consultants, and/or independent contractors.

PD.44165668.1

27.     Additionally, Charles Taylor maintains the secrecy of its Confidential Information, and the client information relating to its goodwill, by housing that information in its internal computer systems. Access to Charles Taylor's computer systems is password-protected and limited to Charles Taylor employees; the systems are not available to the general public.

### The Individual Defendants' Employment with Charles Taylor and Their Contractual Obligations to Charles Taylor

**Defendants Booker, Shroyer, and Williams:**

28.     Defendants Booker, Shroyer, and Williams are experienced insurance adjusters who began employment with Charles Taylor in the summer of 2021.

29.     Charles Taylor actively recruited Defendants Booker, Shroyer, and Williams.  The Company's decision to offer them employment, and their decision to join the Company, was the product of lengthy and arm's-length negotiations regarding the terms and conditions of their employment.

30.     Charles Taylor provided its written offer of employment to Defendant Booker on July 19, 2021.  The Company's offer was for employment as a Senior Executive General Adjuster with a base salary of $150,000 per year and participation in an Incentive Pay Program.  The offer also included a sign-on bonus of $750,000 and the opportunity to earn a Term Production Payment of $1,250,000 if Booker remained employed for five years and brought to Charles Taylor, and maintained, "a team of at least 5 producers during this 5-year period."  (A copy of the Company's written offer of employment to Booker is attached as Exhibit A.)

31.     The Company's offer to Defendant Booker also stated expressly that it was "contingent on your acceptance of, and compliance with, the Company's Proprietary Rights, Intellectual Property, and Restrictive Covenants Agreement – which includes provisions regarding your confidentiality, nondisclosure, noncompetition, and nonsolicitation, obligations to the

9

Company – a copy of which is enclosed with this offer letter." (Ex. A at 2.) The offer stated further that "[t]he covenants contained in the Proprietary Rights, Intellectual Property, and Restrictive Covenants Agreement are an integral part of your employment and your employment with the Company is contingent on your acceptance of that agreement." (*Id.*)

32.     As stated in the letter, the offer letter to Defendant Booker attached a copy of the Company's Proprietary Rights, Intellectual Property, and Restrictive Covenants Agreement. (*Id.*)

33.     Defendant Booker negotiated the terms of the Company's offer with Charles Taylor's then-Chief Executive Officer, Vincent Cole, and then-Managing Director, Cullen Sophy. These negotiations involved many of the terms of the offer but did not address the terms of the Proprietary Rights, Intellectual Property, and Restrictive Covenants Agreement, which were not negotiable as a condition of Defendant Booker's employment.

34.     On July 27, 2021, Defendant Booker sent Mr. Sophy a two-page letter that addressed in detail his requested changes to the employment offer. Booker's letter did not indicate any concerns with his acceptance of the Proprietary Rights, Intellectual Property, and Restrictive Covenants Agreement, the terms of that Agreement, or the requirement that he adhere to that Agreement as a condition of employment with Charles Taylor.

35.     Mr. Sophy sent Defendant Booker an updated offer letter on August 4, 2021. The updated offer letter included the changed terms negotiated and agreed between Charles Taylor and Booker. Mr. Sophy's cover correspondence attaching the letter therefore informed Booker that the updated offer letter "include[d] all of the updated terms that we discussed." (A copy of the updated offer of employment to Defendant Booker, with Mr. Sophy's cover correspondence, is attached as Exhibit B.)

36.    As with the original offer letter, the updated offer stated expressly that it was "contingent on [Booker's] acceptance of, and compliance with, the Company's Proprietary Rights, Intellectual Property, and Restrictive Covenants Agreement" and reinforced that "[t]he covenants contained in the Proprietary Rights, Intellectual Property, and Restrictive Covenants Agreement are an integral part of your employment and your employment with the Company is contingent on your acceptance of that agreement."  (Ex. B.)

37.    Mr. Sophy communicated further with Defendant Booker regarding the offer letter and its attachments on August 21, 2021.  In this correspondence, Mr. Sophy explained to Booker that "[a]s discussed the terms and conditions we provided in the attachments to your offer letter [including the Proprietary Rights, Intellectual Property, and Restrictive Covenants Agreement] speak specifically to requirements typically contained in an employment contract.  There are some conditions to be mindful of such as retaining equipment or any proprietary and confidential information which is not your property."  (A copy of Mr. Sophy's August 21, 2021 correspondence is attached as Exhibit C.)

38.    Defendant Booker signed the offer letter and returned it to Mr. Sophy on August 26, 2021.  The written correspondence did not reflect any concerns or objections to his acceptance of the terms of the Proprietary Rights, Intellectual Property, and Restrictive Covenants Agreement. (A copy of Booker's August 26, 2021 correspondence, with his executed offer letter, is attached as Exhibit D.)

39.    The Company's offers of employment to Defendants Shroyer and Williams also stated that they were "contingent on your acceptance of, and compliance with, the Company's Proprietary Rights, Intellectual Property, and Restrictive Covenants Agreement – which includes provisions regarding your confidentiality, nondisclosure, noncompetition, and nonsolicitation,

PD.44165668.1

obligations to the Company – a copy of which is enclosed with this offer letter."  The offers also stated further that "[t]he covenants contained in the Proprietary Rights, Intellectual Property, and Restrictive Covenants Agreement are an integral part of your employment and your employment with the Company is contingent on your acceptance of that agreement."  (As an example, a copy of Charles Taylor's offer package to Shroyer is attached as Exhibit E.)

40.    As with Defendant Booker, Defendants Shroyer and Williams also negotiated the terms of their employment offers with Charles Taylor.  Those negotiations did not include any effort by Shroyer or Williams to modify or remove the requirement that their employment was contingent on their acceptance of the Proprietary Rights, Intellectual Property, and Restrictive Covenants Agreement.

41.    For example, on August 4, 2021, Mr. Sophy wrote to Defendant Shroyer regarding a revised offer letter that "updated all of the terms we discussed."  The revised offer letter attached to Mr. Sophy's correspondence included the same requirement that Shroyer's employment was contingent on his acceptance of the Proprietary Rights, Intellectual Property, and Restrictive Covenants Agreement.  (A copy of Mr. Sophy's August 4, 2021 correspondence to Shroyer is attached as Exhibit F.)

42.    Mr. Sophy communicated further with Defendant Shroyer on August 6, 2021 regarding further changes that Shroyer requested to the offer, including changes to his base salary, incentive compensation, and benefits.  This correspondence did not address any changes to the terms of the Proprietary Rights, Intellectual Property, and Restrictive Covenants Agreement or the requirement that Shroyer's employment was contingent on his acceptance of that Agreement.  (A copy of Mr. Sophy's August 6, 2021 correspondence to Shroyer is also contained within Exhibit F.)

43.     Defendant Shroyer responded immediately to Mr. Sophy's August 6, 2021 correspondence regarding Charles Taylor's revised offer terms.  Shroyer's response also did not address or indicate any objection to the terms of the Proprietary Rights, Intellectual Property, and Restrictive Covenants Agreement or the requirement that Shroyer's employment was contingent on his acceptance of that Agreement.  (A copy of Shroyer's August 6, 2021 correspondence to Mr. Sophy is attached as Exhibit G.)

44.     On August 20, 2021, Charles Taylor's Senior HR Business Partner – North America, Mike Bastock, sent Defendant Shroyer the Company's final offer of employment, including the requirement to adhere to the terms of the Proprietary Rights, Intellectual Property, and Restrictive Covenants Agreement.  (A copy of Bastock's August 20, 2021 correspondence to Shroyer is attached as Exhibit H.)

45.     Defendant Shroyer signed the offer letter and returned it to Mr. Sophy on August 26, 2021.  The written correspondence did not reflect any concerns or objections to his acceptance of the terms of the Proprietary Rights, Intellectual Property, and Restrictive Covenants Agreement. (A copy of Shroyer's August 26, 2021 correspondence, with his executed offer letter, is attached as Exhibit I.)

46.     Defendant Williams similarly negotiated his offer of employment with Charles Taylor, but those negotiations did not include any request to modify the terms of the Proprietary Rights, Intellectual Property, and Restrictive Covenants Agreement or to remove the requirement that Williams's employment was contingent on acceptance of the Agreement.

47.     For example, Williams communicated with Mr. Sophy regarding the terms of his offer on September 7, 2021 and requested changes to his base salary and sign-on bonus.  This correspondence did not address or indicate any concern with the Proprietary Rights, Intellectual

PD.44165668.1

Property, and Restrictive Covenants Agreement.  (A copy of Williams's September 7, 2021 correspondence with Mr. Sophy is attached as Exhibit J.)

48.     Defendant Williams signed the offer letter (and thereby accepted the Proprietary Rights, Intellectual Property, and Restrictive Covenants Agreement) and returned it to Charles Taylor on September 7, 2021.  (A copy of Williams's signed offer letter and his acceptance correspondence is attached as Exhibit K.)

49.     By accepting employment and the terms of the Proprietary Rights, Intellectual Property, and Restrictive Covenants Agreement, Defendants Booker, Shroyer, and Williams agreed to a number of important covenants and restrictions that were necessary to protect Charles Taylor's legitimate business interests.

50.     First, Defendants Booker, Williams, and Shroyer each acknowledged and agreed that his "position is a position of trust and responsibility with access to Confidential Information, trade secrets, and other information concerning employees, customers, and potential business opportunities of the Company." (*See*, *e.g.*, Ex. A, Proprietary Rights, Intellectual Property, and Restrictive Covenants Agreement § 1.1.) Booker, Williams, and Shroyer further acknowledged and agreed that "the Company's Confidential Information, trade secrets, and other information concerning employees, customers, and potential business opportunities of the Company and the relationship between the Company and each of its employees, customers, and current and potential business partners are valuable assets which may not be used for any purpose other than the Company's business." (*Id.* § 1.2.) Additionally, Booker, Williams, and Shroyer acknowledged and agreed that "the names of customers and current and potential business partners are considered Confidential Information of the business which constitute valuable, special, and unique property of the Company," and that "the Company's customer and current and potential business partner

14

lists and information which have been compiled by the Company represent a material investment of the Company's time and money." (*Id.*) Finally, Booker, Williams, and Shroyer acknowledged and agreed that "the restrictions contained in this Agreement, including, but not limited to, the restrictive covenants set forth in Sections 5-10 below, are reasonable and necessary to protect the Company's legitimate business interests, promote and protect the purpose and subject matter of this Agreement and Employee's employment, [and] deter any potential conflict of interest." (*Id.* § 1.3.)

51.    Second, Defendants Booker, Williams, and Shroyer recognized Charles Taylor's "proprietary rights in the tangible and intangible property of the Company" and acknowledged that they had "not obtained or acquired and shall not obtain or acquire any personal property rights in any of the property of the Company." (*Id.* § 3.1.) Booker, Williams, and Shroyer agreed that during their employment "and any time afterwards all Materials shall be the sole and exclusive property of the Company," and they agreed "to hold all Materials in trust and strict confidence for the Company and its clients, without disclosing such information to any third parties, whether contained in Employee's memory or embodied in writing or other physical form." (*Id.* § 3.2.)[1]

52.    Third, Defendants Booker, Williams, and Shroyer agreed to an express non-disclosure provision, acknowledging that they had and would have "access to proprietary and confidential information, data, trade secrets and knowledge (in whatever form) relating to the Company and/or any Affiliate and their respective businesses and affairs" – referred to as the

---

[1] The Proprietary Rights, Intellectual Property, and Restrictive Covenants Agreement defined "Materials" to include, "without limitation, any writing, communications, manuals, documents, instruments, contracts, agreements, files, literature, data, technical information, know-how, software, secrets, formulas, products, methods, procedures, processes, devices, apparatuses, trademarks, trade names, trade styles, service marks, logos, copyrights, patents, inventions, discoveries, whether or not patentable, that are in any way related to the Company, the Affiliates, or their business." (*Id.* § 3.1.)

"Confidential Information" – which "includes but is not limited to information containing or concerning business strategies and opportunities, customers, prospective customers, current and prospective business partners, pricing practices, contracts, marketing and all other information that belongs to or relates to the Company and its business that is essential to the protection of the goodwill of the Company and/or any Affiliate and to the maintenance of their competitive position in the industry, and/or that the disclosure or improper use of which would be highly detrimental to the Company and/or any Affiliate." (*Id.* § 5.1.)[2]

53.    Accordingly, and "[i]n recognition of the Company's need to protect the legitimate business interests of the Company and the Affiliates," Defendants Booker, Williams, and Shroyer agreed during the course of their employment to keep and maintain Charles Taylor's Confidential Information "as strictly confidential and wholly owned by the Company and/or the applicable Affiliate." (*Id.*) Booker, Williams, and Shroyer further agreed "not to, directly or indirectly: (i) misappropriate, disclose, transfer, assign, disseminate or otherwise communicate or make available (orally, in writing or otherwise) to any person or entity any Confidential Information, or any part thereof; or (ii) use or reproduce (in whatever form) any Confidential Information for Employee's own benefit or purposes or for the benefit or purposes of any person or entity, except as may be reasonably necessary in the performance of the duties and responsibilities of Employee hereunder and in the best interests of the Company or as otherwise may be authorized expressly in writing by the Company." (*Id.*) Moreover, Booker, Williams, and Shroyer agreed that "any Confidential Information is the property of the Company and is essential to the maintenance of Company's competitive position and accordingly should be kept secret," and "specifically agree[d]

---

[2] Confidential Information is further defined to include "any and all information about the Company that is not generally known or available to the public, but has been developed, acquired or compiled by the Company." (*Id.* § 5.1.)

16

to refrain from using to Employee's advantage, or to the advantage of any other person, corporation, partnership, firm or entity, any Confidential Information gained from or in connection with Employee's employment." (*Id.* § 5.2.)

54.    The non-disclosure provision "survive[s] the termination of Employee's employment with the Company for any reason whatsoever and shall remain in full force and effect for either (a) five (5) years following the termination of Employee's employment for any reason for Confidential Information that does not constitute a trade secret under applicable law or (b) for Confidential Information that does constitute a trade secret under applicable law, so long as such information, data, or material constitutes a trade secret (in either case, the 'Confidentiality Period')." (*Id.* § 5.1.)

55.    Fourth, Defendants Booker, Williams, and Shroyer agreed that, during their employment and for a period of one year from the date of their termination of employment for any reason, they would not "directly or indirectly, provide services or sell products that are the same as, similar to, or substitutable for the services or products that Employee provided or sold to, for, or on behalf of the Company during the last year of Employee's employment with the Company to, for, or on behalf of any person (including Employee), company, or entity engaged in the business of insurance services, including pre-loss risk assessment and post-loss claim services, including inspecting, adjusting, surveying, accounting, engineering, auditing, appraisal, subrogation/recovery, salvage, and related services, and/or (2) providing any other type of goods and/or services the same as, substitutable for, or competitive with the goods and/or services provided by the Company during the last year of Employee's employment with the Company." (*Id.* § 7.)  By its terms, this non-competition restriction covered "(i) the United States, (ii) any state or territory in which the Company is engaged in its business at the time of Employee's separation

17

from the Company, and (iii) any state or territory in which Employee was providing services for the Company at the time of Employee's separation from the Company." (*Id.*)

56.     Fifth, Defendants Booker, Williams, and Shroyer agreed that, during their employment and for a period of one year from the date of their termination of employment for any reason, they would not "directly or indirectly, contact, solicit, accept solicited business from, provide services to, or in any way interfere with the Company's relationship with any of the Company's current or prospective clients, customers, or suppliers," without the Company's consent and "for purposes of providing services that are the same as, similar to, substitutable for, or competitive with the services and/or products that the Company provided or offered during the last year of Employee's employment with the Company." (*Id.* § 8.) This restriction expressly applied to the Company's current or prospective clients, customers, or suppliers (1) that Booker, Williams, and Shroyer "directly interacted" with, (2) that an employee supervised by Booker, Williams, and Shroyer "directly interacted" with, or (3) about whom Booker, Williams, and Shroyer "obtained or received non-public information." (*Id.*)

57.     Sixth, Defendants Booker, Williams, and Shroyer similarly agreed that, during their employment and for a period of one year from the date of their termination of employment for any reason, they would not, on their own behalf or on behalf of any other person or entity, "directly or indirectly, solicit for employment or hire or assist in the solicitation or hiring of any employee, consultant, or independent contractor who worked for or is affiliated with the Company during the last year of Employee's employment with the Company and, during that time, either (i) reported, directly or indirectly to Employee, (ii) worked with Employee on any Company-related project, product, or service, or (iii) worked for or with the same customer(s) as Employee." (*Id.* § 9.) This provision further states that Booker, Williams, and Shroyer would be presumed to have violated

this provision if, during the post-employment restricted period, "any business or enterprise in which Employee participates in any manner hires, engages, recruits, solicits, or induces any employee, consultant, or independent contractor covered by this provision." (*Id.*)

58.     Finally, Defendants Booker, Williams, and Shroyer agreed to return all Company property "immediately upon the termination of [his] employment with the Company, for any reason." (*Id.* § 6.)

59.     In entering into the Restrictive Covenants Agreement, Defendants Booker, Williams, and Shroyer acknowledged and agreed that "the covenants contained herein are intended to ensure that the Company, the Affiliates, and their respective businesses are not adversely affected by Employee acting in a manner contrary to this Agreement and thereby damaging the results, prospects, and goodwill associated with the business (both present and future) of the Company and/or any Affiliate; that a breach of any section of this Agreement will cause serious harm to the Company and/or the Affiliates; and that all of the covenants and restrictions contained herein are reasonable and valid and all defenses to the enforcement thereof are hereby expressly waived." (*Id.* § 11.2.)

60.     Among other remedies available to Charles Taylor for violations of the Restrictive Covenants Agreement, the parties agreed that "because of the immediate and irreparable damage that would be caused to the Company and for which monetary damages would not be a sufficient remedy and which harm would not be fully or adequately compensated by recovery of damages alone, Charles Taylor, "in addition to all other remedies and damages that may be available to the Company hereunder and at law or in equity, . . . shall be entitled to specific performance and any injunctive or other equitable relief as a remedy for any such breach without payment of any bond." (*Id.* § 11.3.)

PD.44165668.1

61.     During their employment with Charles Taylor, the Company viewed Defendants Booker, Williams, and Shroyer as productive and valued employees.

62.     During their employment with Charles Taylor, Defendants Booker, Williams, and Shroyer were responsible for generating new client business and developing business with existing clients.

63.     Defendants Booker, Williams, and Shroyer relied on Charles Taylor to help them develop client relationships by, for example, sponsoring client events, financing their membership in professional and networking organizations, and investing in marketing and sales tools, all of which the Individual Defendants used to form and strengthen client relationships on Charles Taylor's behalf.  The Individual Defendants also relied on the support of their team, comprised of Charles Taylor employees (including Defendants Miller and Patrick), to ensure their success.

64.     While employed by Charles Taylor, Defendants Booker, Williams, and Shroyer gained valuable knowledge of Charles Taylor's current and prospective clients and business partners, including their business needs and preferences, as well as their fees paid to Charles Taylor, amounts paid in response to insurance claims, and other like information essential to clients' businesses.

65.     While employed by Charles Taylor, Defendants Booker, Williams, and Shroyer likewise gained valuable knowledge of Charles Taylor's business practices and strategies, business opportunities, pricing practices, contracts, and marketing – in essence, the foundational elements that Charles Taylor relies upon to maintain and develop its competitive position in the industry.

66.     Charles Taylor also invested heavily in Defendants Booker, Williams, and Shroyer to help build the Company's Mississippi-based business specifically and, more generally, the Company's property and casualty adjusting business.  This investment included, but was not

limited to, devoting substantial Company resources to the Individual Defendants' business development efforts, providing the Individual Defendants with access to the Company's broad property and casualty client base, and providing the Individual Defendants with opportunities and resources to expand their existing client relationships in collaboration with Charles Taylor.

**Defendants Miller and Patrick:**

67.     Defendants Miller and Patrick are experienced administrators and managers who also joined Charles Taylor in 2021 to support Defendants Booker, Williams, and Shroyer in building and developing the Company's Mississippi business.

68.     Because their work for Charles Taylor would include managing client relationship matters and key client information, Charles Taylor also required Defendants Miller and Patrick to agree to comprehensive restrictive covenants – tailored to their positions – as a condition of employment with the Company.

69.     The offer letters that Charles Taylor sent to Defendants Miller and Patrick therefore included a non-competition covenant, which provided that during their employment and for a period of twelve (12) months following their separations from employment, Defendants Miller and Patrick "will not directly or indirectly engage in any activity, whether on your own behalf or as an employee, consultant or independent contractor of any other person or entity that competes with Charles Taylor Adjusting."  (Copies of the offer letters signed by Miller and Patrick are attached as Exhibits L and M, respectively.)

70.     Defendants Miller and Patrick also agreed to an employee non-solicitation covenant, which provided that during their employment and for a period of twelve (12) months following their separations from employment, they "will not employ, hire, solicit, induce or identify for employment or attempt to employ, hire, solicit, induce or identify for employment,

directly or indirectly, any employee(s) of the Company or its subsidiaries to leave his or her employment and become an employee, consultant or representative of any other entity, including but not limited to your new employer." (*See* Exs. L & M at § 13.)

71.    Defendants Miller and Patrick further agreed that at all times during and after their employment, they would not disseminate, replicate, or use any of Charles Taylor's confidential, proprietary, and trade secret information outside of the scope of their employment. (*Id.* § 11.)

## Defendants Booker and Shroyer are Awarded Equity and, in Return, Agree to Further Restrictive Covenants

72.    In July 2023, in recognition of their value to Charles Taylor, Defendants Booker and Shroyer were offered the opportunity to attain equity in the Company by entering into an agreement with certain U.K.-based affiliates of Charles Taylor.

73.    Specifically, on July 7, 2023, Defendants Booker and Shroyer each signed a Deed of Adherence which had the effect of making them parties to an Investment and Shareholders' Deed dated June 16, 2020, and entitling them to equity in the venture. (True and correct copies of the Deeds of Adherence and relevant excerpts of the Investment and Shareholders' Deed are attached hereto as Exhibits N and O, respectively.)

74.    Under the terms of the Investment and Shareholders' Deed, Defendants Booker and Shroyer agreed that, during their employment, they would not "be concerned in any business (other than the business of the Group) whether or not in competition with any business carried on by the Group, without prior written notification of the same." (Ex. O § 18.3(a).) Defendants Booker and Shroyer also agreed that, for six months following the cessation of their employment, they would not "be concerned in any business within any country which, in the 12-month period immediately preceding the [date of the cessation of their employment], competes with the business of all or any part of the Group." (*Id.* § 18.3(b).) The Investment and Shareholders' Deed defines the "Group"

as "Topco and its subsidiary undertakings from time to time," and "Topco," in turn, is defined as Jewel Topco Ltd., an English corporate entity. (*Id.* § 1.1 and Parties Clause.) Charles Taylor is one of Jewel Topco's "subsidiary undertakings" as referenced in the Investment and Shareholders' Deed. Thus, in addition to the confidentiality and nonsolicitation obligations that Defendants Booker and Shroyer undertook as a condition of employment in signing their offer letters and accepting their restrictive covenant agreements, Defendants Booker and Shroyer, through the Investment and Shareholders' Deed, further agreed not to compete with Charles Taylor for six months following the cessation of their employment.

75.    Under the terms of the Investment and Shareholders' Deed, Defendants Booker and Shroyer each agreed further that, during their employment and for six months following the cessation of their employment, they would not "on his own account or for any other person solicit the services of, or endeavour to entice away from the Group, any person who was, in the 12 month period immediately preceding the Relevant Date, employed or engaged by the Group whether or not such person would commit a breach of his employment or consultancy contract by reason of leaving service. (*Id.* § 18.3(c).)

76.    Under the terms of the Investment and Shareholders' Deed, Defendants Booker and Shroyer each also further agreed that, during their employment and for six months following the cessation of their employment, they would not "solicit or entice away or endeavour to solicit or entice away from the Group (either on his own account or as the agent or employee of any other person) the custom of any person, firm, company or other entity, in respect of goods or services competitive" with Charles Taylor's services. (*Id.* § 18.3(e).)

**Charles Taylor Discovers the Individual Defendants' Secret Competitive Activities and
Promptly Terminates Their Systems Access**

77.     Although the Individual Defendants were valued Charles Taylor employees, Charles Taylor's investment in them was a one-way street.  While Charles Taylor was committing significant efforts and asserts to building its Mississippi business, with the Individual Defendants as the foundation of that business, the Individual Defendants were negotiating secretly with Defendant Crawford & Company and developing a plan for their mass resignation from Charles Taylor and the conversion of the Company's Mississippi business to Crawford.

78.     On November 15, 2023, just a few days before the Thanksgiving holiday, the Individual Defendants sent simultaneous letters to Charles Taylor, informing the Company that they were resigning from employment.

79.     Although, the Individual Defendants did not expressly inform Charles Taylor that they were leaving to accept employment with Crawford & Company or any other competitor, these November 15, 2023 communications revealed to Charles Taylor for the first time the Individual Defendants' previously secret plan to move to Crawford & Company and to convert Charles Taylor's clients to Crawford.

80.     Upon receiving these letters, Charles Taylor was stunned. The Company had invested substantial resources in its Mississippi office and – as Company executives had discussed with Defendant Booker on many occasions – was planning to expand the Mississippi office substantially by hiring additional high-level employees and bringing in significant additional business.  The Company had also just recently launched a new website that featured its property and casualty adjusting capabilities, of which the Individual Defendants were an integral part.

81.     On information and belief, the Individual Defendants began informing Charles Taylor clients that they serviced (and other outside business partners who they worked with) of

their intent to move to Crawford & Company well before the Individual Defendants notified Charles Taylor of their resignations.  Also on information and belief, Crawford & Company actively assisted the Individual Defendants in converting business and clients from Charles Taylor while the Individual Defendants were still employed by Charles Taylor.

82.     Indeed, a Microsoft Teams message sent from Defendant Miller to Defendant Patrick suggests that the Individual Defendants accepted employment with Crawford & Company in mid-October 2023, at least 3 to 4 weeks before they informed Charles Taylor of their resignations.  Charles Taylor believes and understands that the Individual Defendants (in concert with Crawford & Company) used this long window of time – when they were still employed by Charles Taylor and Charles Taylor was blind to their secret plans – to get a head-start on contacting clients and other partners regarding their forthcoming change in employment and in soliciting those clients and partners for the benefit of Crawford & Company.

83.     Upon learning of the Individual Defendants' resignations, Charles Taylor promptly terminated their access to the Company's computer systems and placed them on paid leaves of absence through their contractual notice periods.

84.     Unfazed, the Individual Defendants continued to press forward with their plans to solicit and convert clients for Crawford & Company.  For example, during Defendant Booker's notice period – when he was still employed by and had obligations to Charles Taylor – Charles Taylor received a notice from one client requesting that Charles Taylor transfer the client's claim files to Crawford.

85.     In the hopes that the Individual Defendants would respect their contractual commitments, Charles Taylor (through outside counsel) promptly put the Individual Defendants on notice that their competitive activities constituted violations of their restrictive covenants. On

PD.44165668.1

November 17, 2023, Charles Taylor sent the Individual Defendants separate letters (a) informing them that their employment with Crawford & Company would be a breach of their restrictive covenant agreements and (b) reminding them of their post-employment legal and contractual obligations. Charles Taylor demanded that the Individual Defendants cease and desist from all violations of their restrictive covenants and confirm their compliance by November 27, 2023. (True and correct copies of the November 17, 2023 letter are attached hereto as Exhibit P.)

86.    By letter dated the same day, Charles Taylor (through outside counsel) also informed Crawford & Company of the Individual Defendants' post-employment restrictive covenant obligations and requested that Crawford & Company provide assurances that it would not employ the Individual Defendants in breach of those restrictions. (A true and correct copy of the November 17, 2023 letter to Crawford is attached hereto as Exhibit Q.)

87.    By letter dated November 29, 2023, Charles Taylor reiterated to the Individual Defendants, through their legal counsel, that they were bound by their post-employment obligations to the Company, both as established by law and as agreed-to through their restrictive covenant agreements. (A true and correct copy of the November 29, 2023 letter to the Individual Defendants is attached hereto as Exhibit R.)

88.    Following the Individual Defendants' separations from employment, Charles Taylor discovered that the Individual Defendants had taken significant steps to hide their violations of their contractual and legal obligations to the Company. These steps included, without limitation, the Individual Defendants' permanent deletion of all information from their Company-owned devices before they returned those devices to Charles Taylor. The Individual Defendants performed this deletion intentionally even though the Individual Defendants knew that those devices, and the information on the devices belonged, to Charles Taylor.

89.    On information and belief, Defendant Crawford & Company instructed the Individual Defendants to delete the information from their Charles Taylor devices and/or advised the Individual Defendants on actions they could take to hide their violations of their contractual and legal obligations to Charles Taylor.

90.    In no uncertain terms, the Individual Defendants benefitted significantly during their employment from Charles Taylor's goodwill, client relationships, business strategies, marketing, and client support, and gained protected and confidential information about Charles Taylor's customers, business partners, pricing strategies, and business activities that they would not have obtained but for their employment with Charles Taylor.  Now, the Individual Defendants have sought to convert, and continue to seek to convert, that goodwill, confidential information, and other protected business interests for their own benefit and the benefit of their new employer, Crawford & Company, all in direct competition with Charles Taylor.

91.    The Individual Defendants also benefitted significantly from Charles Taylor's investment in its Mississippi business – and substantial direct investment in their business – during their employment.  Charles Taylor obtained office space and technological resources for the Individual Defendants, hired additional adjusters to support the Individual Defendants, and its senior executives communicated directly with the Individual Defendants regarding its confidential plans to further grow its business (and their business) in and around Mississippi.

92.    The impact of the Individual Defendants' breaches cannot be understated.  Charles Taylor's Mississippi business, focused on the Individual Defendants, generated over $3.5 million in revenue for the Company in 2022 and was on track to generate even more revenue for the Company in 2023.  On information and belief, the Individual Defendants, in concert with Crawford

& Company, now intend to convert (and have already started to convert) nearly all of that business to Crawford & Company.

93.    The harm that would be caused by the Individual Defendants' continued solicitation of Charles Taylor's clients and customers and continued use and disclosure of Charles Taylor's confidential information, all for the direct benefit of Defendant Crawford & Company) includes (1) the loss of Charles Taylor's business goodwill and confidential and proprietary information; (2) the loss of Charles Taylor's competitive advantage; (3) the loss of Charles Taylor's market share; (4) reputational harm; (5) the loss of additional business from Charles Taylor's existing clients; (6) the loss of additional client relationships, including those clients that the Individual Defendants have already solicited for Crawford & Company; and (7) the loss of additional employee and consultant relationships. Thus, by competing and continuing to compete with Charles Taylor in breach of their contractual obligations, the Individual Defendants continue to harm Charles Taylor's business (and Crawford & Company continues to knowingly assist the Individual Defendants in continuing to harm that business), thereby necessitating this lawsuit.

### COUNT I – BREACH OF CONTRACT
### (BREACH OF PROPRIETARY RIGHTS, INTELLECTUAL PROPERTY, AND RESTRICTIVE COVENANTS AGREEMENT
### AGAINST DEFENDANTS BOOKER, SHROYER, AND WILLIAMS)

94.    Charles Taylor repeats and realleges each and every allegation contained in the foregoing Paragraphs as if fully set forth herein.

95.    The Proprietary Rights, Intellectual Property, and Restrictive Covenants Agreement is a valid and binding contract between Charles Taylor and Defendants Booker, Shroyer, and Williams that was incorporated into their offer letters and that each of those Defendants agreed and accepted to as a condition of accepting Charles Taylor's offer of employment.

96.    As set forth in detail above, Defendants Booker, Shroyer, and Williams breached the Proprietary Rights, Intellectual Property, and Restrictive Covenants Agreement by improperly and without justification:

(a)    Accepting and commencing employment with Defendant Crawford & Company in positions identical to their prior positions with Charles Taylor, in violation of § 7 of the Agreement.

(b)    Soliciting business from Charles Taylor's clients, customers, and business partners that they interacted with during their employment with Charles Taylor, both during and after their employment in violation of § 8 of the Agreement;

(c)    Soliciting and ultimately hiring Defendants Miller and Patrick – both of whom interacted with the same clients, customers, and/or business partners that Defendants Booker, Shroyer, and Williams have been actively soliciting – to work for Crawford & Company, during his employment with Charles Taylor in violation of § 9 of the Agreement;

(d)    Disclosing Charles Taylor's Confidential Information to Crawford & Company and, upon information and/or belief, to clients, customers, and/or business partners of Charles Taylor in an effort to unlawfully undercut Charles Taylor's business in violation of §§ 1.2, 5.1, and 5.2 of the Agreement; and

(e)    Destroying and failing to return Charles Taylor's property upon the termination of their employment in violation of § 6 of the Agreement.

97.    Charles Taylor, on the other hand, faithfully performed its obligations to Defendants Booker, Shroyer, and Williams under their Proprietary Rights, Intellectual Property, and Restrictive Covenants Agreements.

98.    As a direct and proximate result of Defendants Booker, Shroyer, and Williams's breach of their Proprietary Rights, Intellectual Property, and Restrictive Covenants Agreements, Charles Taylor has suffered significant damages, including attorneys' fees and costs, in an amount to be determined at trial.

**COUNT II – BREACH OF CONTRACT**
**(BREACH OF OFFER LETTER RESTRICTIVE COVENANTS AGAINST**
**DEFENDANTS MILLER AND PATRICK)**

99.    Charles Taylor repeats and realleges each and every allegation contained in the foregoing Paragraphs as if fully set forth herein.

100.    The Offer Letters signed by Defendants Miller and Patrick are valid and binding contracts between those Defendants and Charles Taylor.

101.    As set forth in detail above, Defendants Miller and Patrick breached the restrictive covenants in their offer letters by improperly and without justification:

      (a)    Accepting and commencing employment with Defendant Crawford & Company in positions identical to their prior positions with Charles Taylor, in violation of § 11 of their offer letters;

      (b)    Disclosing Charles Taylor's Confidential Information to Crawford & Company and, upon information and belief, to clients, customers, and/or business partners of Charles Taylor in an effort to unlawfully undercut Charles Taylor's business in violation of § 11 of their offer letters; and

      (c)    Destroying and failing to return Charles Taylor's property upon the termination of their employment in violation of § 11 of their offer letters.

102.    Charles Taylor, on the other hand, faithfully performed its contractual obligations to Defendants Miller and Patrick under their offer letters.

103.    As a direct and proximate result of Defendants Miller and Patrick's breach of the restrictive covenants in their offer letters, Charles Taylor has suffered significant damages, including attorneys' fees and costs, in an amount to be determined at trial.

**COUNT III – BREACH OF CONTRACT**
**(BREACH OF THE INVESTMENT AND SHAREHOLDERS' DEED AGAINST**
**DEFENDANTS BOOKER AND SHROYER)**

104.    Charles Taylor repeats and realleges each and every allegation contained in the foregoing Paragraphs as if fully set forth herein.

PD.44165668.1

105.    The Investment and Shareholders' Deed is a valid and binding contract between Charles Taylor (as Jewel Topco's subsidiary) and Defendants Booker and Shroyer, of which Booker and Shroyer became parties through the Deed of Adherence.

106.    As set forth in detail above, Defendants Booker and Shroyer breached § 18.3 of the Investment and Shareholders' Deed by improperly and without justification seeking and accepting competitive employment with Crawford & Company, soliciting other Charles Taylor employees for employment with Crawford & Company, soliciting Charles Taylor's clients for the benefit of Crawford & Company, and misappropriating Charles Taylor's confidential information.

107.    Charles Taylor, on the other hand, faithfully performed its obligations under the Investment and Shareholders' Deed.

108.    As a direct and proximate result of Defendants Booker and Shroyer's breach of the Investment and Shareholders' Deed, Charles Taylor has suffered significant damages, including attorneys' fees and costs, in an amount to be determined at trial.

## COUNT IV – BREACH OF FIDUCIARY DUTY / DUTY OF LOYALTY
### (AGAINST THE INDIVIDUAL DEFENDANTS)

109.    Charles Taylor repeats and realleges each and every allegation contained in the foregoing Paragraphs as if fully set forth herein.

110.    As a matter of law, the Individual Defendants, as key employees of Charles Taylor, owed the fiduciary duties of good faith and loyalty to Charles Taylor in the performance of their duties.

111.    So long as the Individual Defendants remained employed by Charles Taylor, the Company depended upon the Individual Defendants to act only in Charles Taylor's best interests.

PD.44165668.1

112.    An employee may breach his or her fiduciary duties to the employer by improperly using the employer's time, resources, or proprietary information to benefit a competing business, such as Defendant Crawford & Company.

113.    Here, as described in detail above, the Individual Defendants did just that, working secretly with Defendant Crawford & Company – while they were still employed by Charles Taylor – to develop and execute a plan to convert business from Charles Taylor to Crawford, including through the use of Charles Taylor's confidential, proprietary, and trade secret information.  This conduct was a quintessential breach of the Individual Defendants' fiduciary duty and/or duty of loyalty.

114.    As a direct and proximate cause of the Individual Defendants' breach of their fiduciary duty and/or duty of loyalty owed to Charles Taylor, Charles Taylor has suffered, and will continue to suffer, damages as a result of the Individual Defendants' conduct in an amount to be determined at trial.

115.    Further, in breaching their fiduciary duty and/or duty of loyalty to Charles Taylor, the Individual Defendants acted with malice and reckless indifference to the rights of Charles Taylor.

### COUNT V – UNFAIR COMPETITION
### (AGAINST DEFENDANT CRAWFORD & COMPANY)

116.    Charles Taylor repeats and realleges each and every allegation contained in the foregoing Paragraphs as if fully set forth herein.

117.    To establish a cause of action for relief based on unfair competition, a plaintiff must demonstrate that the defendant wrongfully diverted the plaintiff's business to itself.

118.    Here, that is precisely what has occurred and continues to occur. As described above, Defendant Crawford and Company worked in concert with the Individual Defendants to

PD.44165668.1

develop a plan to convert and divert Charles Taylor's business for the benefit of Crawford & Company – including through the use of Charles Taylor's goodwill and Confidential Information – both while the Individual Defendants were still employed by Charles Taylor and immediately following the Individual Defendants' separations from employment.

119.    Defendant Crawford & Company undertook these actions in concert with the Individual Defendants knowing that the actions were in violation of the Individual Defendants' legal obligations to Charles Taylor and were in violation of the Individual Defendants' contractual restrictive covenant obligations to Charles Taylor.

120.    By and through this conduct, Crawford & Company sought to compete unfairly with Charles Taylor.

121.    These willful and intentional acts interfered with Charles Taylor's ability to conduct its business and tampered Charles Taylor's reasonable expectations that Crawford & Company would honor the Individual Defendants' legal and contractual employment and post-employment obligations.

122.    Crawford & Company's conduct is a direct and proximate cause of Charles Taylor's harm and damages.

123.    Further, in unfairly competing with Charles Taylor, Crawford & Company acted with malice and reckless indifference to Charles Taylor's rights.

## COUNT VI – TORTIOUS INTERFERENCE WITH CONTRACT (AGAINST DEFENDANT CRAWFORD & COMPANY)

124.    Charles Taylor repeats and realleges each and every allegation contained in the foregoing Paragraphs as if fully set forth herein.

125.    As described more fully above, Defendant Crawford & Company knew that the Individual Defendants had legal and contractual non-competition, non-solicitation, and

confidentiality obligations to Charles Taylor, both during and after their employment with the Company.

126.    In hiring the Individual Defendants to work in competing positions, in working in concert with the Individual Defendants to convert and divert Charles Taylor's client business, in working in concert with Defendant Booker to solicit (and ultimately hire) the other Individual Defendants, and in working in concert with the Individual Defendants to use and exploit Charles Taylor's confidential, proprietary, and trade secret information, Defendant Crawford & Company intentionally and tortiously interfered (and continues to tortiously interfere) with Charles Taylor's contractual relationships with the Individual Defendants.

127.    There was no justification for Defendant Crawford & Company's actions and those actions were a proximate and legal cause of the Individual Defendants' own breaches of their contractual obligations to Charles Taylor.

128.    Further, in tortiously interfering with Charles Taylor's contractual relationships with the Individual Defendants, Defendant Crawford & Company acted with malice and reckless indifference to Charles Taylor's rights.

**COUNT VII – TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS / PROSPECTIVE ECONOMIC ADVANTAGE (AGAINST ALL DEFENDANTS)**

129.    Charles Taylor repeats and realleges each and every allegation contained in the foregoing Paragraphs as if fully set forth herein.

130.    As described more fully above, Charles Taylor's business is dependent upon its goodwill and relationships with its customers and business partners.

131.    As employees of Charles Taylor, the Individual Defendants were aware of Charles Taylor's goodwill and relationships with these customers and business partners. Indeed, through

Charles Taylor, the Individual Defendants generated significant revenue from these customers and business partners for Charles Taylor's benefit.

132.    The Individual Defendants have intentionally interfered with and injured Charles Taylor's goodwill and relationships with these customers and business partners because the Individual Defendants have successfully solicited business from some or all of these customers and business partners in violation of their contractual restrictive covenant obligations to Charles Taylor.

133.    Defendant Crawford & Company has similarly intentionally interfered with and injured Charles Taylor's goodwill and relationships with these customers and business partners because Crawford & Company, in concert with the Individual Defendants, has successfully solicited business from some or all of these customers and business partners in knowing violation of the Individual Defendants' contractual restrictive covenant obligations to Charles Taylor.

134.    The Individual Defendants' and Crawford & Company's intentional interference with these relationships was done through improper and unfair means because they acted covertly and in concert with each other to solicit business from these customers and business partners for Crawford & Company's benefit – starting while the Individual Defendants were still employed by Charles Taylor – in a clear case of unfair competition and in direct violation of the Individual Defendants' fiduciary duty and/or duty of loyalty to Charles Taylor (as well as in direct violation of the Individual Defendants' contractual restrictive covenant obligations to Charles Taylor.

135.    As a direct and proximate result of the Individual Defendants' and Crawford & Company's interference with Charles Taylor's relationships with these customers and business partners, Charles Taylor has suffered damages in an amount to be determined at trial.

PD.44165668.1

136.    Further, in tortiously interfering with Charles Taylor's relationships with these customers and business partners, the Individual Defendants' and Crawford & Company acted with malice and reckless indifference to Charles Taylor's rights.

### COUNT VIII – MISAPPROPRIATION OF CONFIDENTIAL INFORMATION (AGAINST THE INDIVIDUAL DEFENDANTS)

137.    Charles Taylor repeats and realleges each and every allegation contained in the foregoing Paragraphs as if fully set forth herein.

138.    As described more fully above, the Individual Defendants obtained access to Charles Taylor's confidential information throughout the course of their employment, including but not limited to information containing or concerning Charles Taylor's business strategies and opportunities, customers, prospective customers, current and prospective business partners, pricing practices, contracts, and marketing strategies.

139.    As also described more fully above, the Individual Defendants took a substantial amount of Charles Taylor's confidential information when they left employment with the Company.  Upon information and belief, the Individual Defendants are using (and have used) that confidential information for the benefit of themselves and Crawford & Company to undercut Charles Taylor's competitive position in the market and obtain business that would otherwise belong to Charles Taylor but for the Individual Defendants' actions.

140.    Aside from their contractual prohibitions against such misappropriation, in using and misappropriating Charles Taylor's confidential information in this manner, the Individual Defendants breached the independent duties of good faith, fair dealing, and loyalty that they owed to Charles Taylor not to exploit its confidential information for the benefit of themselves and others.

PD.44165668.1

141.    The Individual Defendants further unlawfully sought to prevent Charles Taylor from learning of their misappropriation of Charles Taylor's confidential information by, among other actions, permanently deleting all information from their company-owned devices prior to returning those devices to Charles Taylor.  The Individual Defendants took these egregious actions even though they knew that the information on those devices belonged to Charles Taylor and that they were under a legal obligation to preserve the information on those devices.

142.    As a direct and proximate result of the Individual Defendants' misappropriation of Charles Taylor's Confidential Information, Charles Taylor has suffered damages in an amount to be determined at trial.

143.    Further, in misappropriating Charles Taylor's Confidential Information, the Individual Defendants acted with malice and reckless indifference to Charles Taylor's rights.

## DEMAND FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against the Individual Defendants and Crawford & Company as follows:

1.    With respect to Count I, Charles Taylor demands judgment in its favor and against Defendants Booker, Shroyer, and Williams for:

> (a)    actual damages that Charles Taylor is entitled to recover as a result of Defendants Booker, Shroyer, and Williams's breaches of their Proprietary Rights, Intellectual Property, and Restrictive Covenants Agreements;

> (b)    incidental and consequential damages as permitted by law;

> (c)    an equitable accounting, disgorgement, forfeiture, and delivery to Charles Taylor of all assets, income, profits, pecuniary benefits, and all illicitly obtained gains or profits resulting from Defendants Booker, Shroyer, and Williams's breaches of contract;

> (d)    injunctive relief prohibiting Defendants Booker, Shroyer, and Williams from violating their Proprietary Rights, Intellectual Property, and Restrictive Covenants Agreements;

PD.44165668.1

(e)    Charles Taylor's attorneys' fees and costs incurred in enforcing the terms of the Proprietary Rights, Intellectual Property, and Restrictive Covenants Agreements, as permitted by the Proprietary Rights, Intellectual Property, and Restrictive Covenants Agreements;

(f)    pre- and post-judgment interest; and

(g)    all such other relief as this Court deems appropriate.

2.    With respect to Count II, Charles Taylor demands judgment in its favor and against Defendants Miller and Patrick for:

(a)    actual damages that Charles Taylor is entitled to recover as a result of Defendants Miller and Patrick's breaches of the restrictive covenants in their offer letters;

(b)    incidental and consequential damages as permitted by law;

(c)    an equitable accounting, disgorgement, forfeiture, and delivery to Charles Taylor of all assets, income, profits, pecuniary benefits, and all illicitly obtained gains or profits resulting from Defendants Miller and Patrick's breaches of contract;

(d)    injunctive relief prohibiting Defendants Miller and Patrick from violating the restrictive covenants in their offer letters;

(e)    pre- and post-judgment interest; and

(f)    all such other relief as this Court deems appropriate

3.    With respect to Count III, Charles Taylor demands judgment in its favor and against Defendants Booker and Shroyer for:

(a)    actual damages that Charles Taylor is entitled to recover as a result of Defendants Booker and Shroyer's breaches of the Investment and Shareholders' Deed;

(b)    incidental and consequential damages as permitted by law;

(c)    an equitable accounting, disgorgement, forfeiture, and delivery to Charles Taylor of all assets, income, profits, pecuniary benefits, and all illicitly obtained gains or profits resulting from Defendants Booker and Shroyer's breaches of contract;

(d)    injunctive relief prohibiting Defendants Booker and Shroyer from violating the Investment and Shareholders' Deed;

(e)    Charles Taylor's attorneys' fees and costs incurred in enforcing the terms of the Investment and Shareholders' Deed;

(f)    pre- and post-judgment interest; and

(g)    all such other relief as this Court deems appropriate.

4.    With respect to Count IV, Charles Taylor demands judgment in its favor and against the Individual Defendants for:

(a)    actual damages that Charles Taylor is entitled to recover as a result of the Individual Defendants' breaches of their fiduciary duty and/or duty of loyalty;

(b)    incidental, consequential, and punitive damages as permitted by law;

(c)    an equitable accounting, disgorgement, forfeiture, and delivery to Charles Taylor of all assets, income, profits, pecuniary benefits, and all illicitly obtained gains or profits resulting from the Individual Defendants' breaches of their fiduciary duty and/or duty of loyalty;

(d)    Charles Taylor's attorneys' fees and costs incurred in prosecuting this claim, to the extent permitted by law;

(e)    pre- and post-judgment interest; and

(f)    all such other relief as this Court deems appropriate.

5.    With respect to Count V, Charles Taylor demands judgment in its favor and against Crawford & Company for:

(a)    actual damages that Charles Taylor is entitled to recover as a result of Crawford & Company's unfair competition;

(b)    incidental, consequential, and punitive damages as permitted by law;

(c)    an equitable accounting, disgorgement, forfeiture, and delivery to Charles Taylor of all assets, income, profits, pecuniary benefits, and all illicitly obtained gains or profits resulting from Crawford & Company's unfair competition;

(d)    preliminary and permanent injunctive relief prohibiting Crawford & Company from engaging in unfair competition;

(e)    Charles Taylor's attorneys' fees and costs incurred in prosecuting this claim, to the extent permitted by law;

(f)    pre- and post-judgment interest; and

PD.44165668.1

(g)    all such other relief as this Court deems appropriate.

6.    With respect to Count VI, Charles Taylor demands judgment in its favor and against Crawford & Company for:

(a)    actual damages that Charles Taylor is entitled to recover as a result of Crawford & Company's tortious interference with contract;

(b)    incidental, consequential, and punitive damages as permitted by law;

(c)    an equitable accounting, disgorgement, forfeiture, and delivery to Charles Taylor of all assets, income, profits, pecuniary benefits, and all illicitly obtained gains or profits resulting from Crawford & Company's tortious interference with contract;

(d)    injunctive relief prohibiting Crawford & Company from tortiously interfering with Charles Taylor's contracts with the Individual Defendants and/or any other current or former employee of Charles Taylor;

(e)    Charles Taylor's attorneys' fees and costs incurred in prosecuting this claim, to the extent permitted by law;

(f)    pre- and post-judgment interest; and

(g)    all such other relief as this Court deems appropriate.

7.    With respect to Count VII, Charles Taylor demands judgment in its favor and against the Individual Defendants and Crawford & Company for:

(a)    actual damages that Charles Taylor is entitled to recover as a result of their tortious interference with business relations/prospective economic advantage;

(b)    incidental, consequential, and punitive damages as permitted by law;

(c)    an equitable accounting, disgorgement, forfeiture, and delivery to Charles Taylor of all assets, income, profits, pecuniary benefits, and all illicitly obtained gains or profits resulting from their tortious interference with business relations/prospective economic advantage;

(d)    injunctive relief prohibiting the Individual Defendants and Crawford & Company from tortiously interfering with Charles Taylor's relationships with customers and business partners;

(e)    Charles Taylor's attorneys' fees and costs incurred in prosecuting this claim, to the extent permitted by law;

PD.44165668.1

(f)     pre- and post-judgment interest; and

(g)     all such other relief as this Court deems appropriate.

8.      With respect to Count VIII, Charles Taylor demands judgment in its favor and against the Individual Defendants for:

(a)     actual damages that Charles Taylor is entitled to recover as a result of the Individual Defendants' misappropriation of Charles Taylor's confidential information;

(b)     incidental, consequential, and punitive damages as permitted by law;

(c)     an equitable accounting, disgorgement, forfeiture, and delivery to Charles Taylor of all assets, income, profits, pecuniary benefits, and all illicitly obtained gains or profits resulting from the Individual Defendants' misappropriation of Charles Taylor's confidential information;

(d)     injunctive relief prohibiting the Individual Defendants from misappropriating Charles Taylor's confidential information;

(e)     Charles Taylor's attorneys' fees and costs incurred in prosecuting this claim, to the extent permitted by law;

(f)     pre- and post-judgment interest; and

(g)     all such other relief as this Court deems appropriate.

PD.44165668.1

Respectfully submitted,

Dated: January 11, 2024

**PHELPS DUNBAR LLP**

*/s/ Nicholas F. Morisani*
Nicholas F. Morisani, MB # 104970
4270 I-55 North
Jackson, MS 39211-6391
Tel: 610-360-9351
nick.morisani@phelps.com

**BLANK ROME LLP**

Michael A. Iannucci (*phv to be filed*)
Frederick G. Sandstrom (*phv to be filed*)
130 N. 18th Street
Philadelphia, PA 19103
Tel.: (215) 569-5500
michael.iannucci@blankrome.com
gus.sandstrom@blankrome.com

*Attorneys for Plaintiff*

## <u>VERIFICATION</u>

I, Robert Arnold, in my capacity as Managing Director of Plaintiff LAD (Aviation), Inc. d/b/a Charles Taylor Adjusting, hereby state that I have read and am familiar with the facts set forth in the foregoing Verified Complaint, that I am authorized to execute this Verification on behalf of Plaintiff, and that the facts set forth therein are true and correct to the best of my knowledge, information, and belief.

This Verification is made subject to the penalties of 28 U.S.C. § 1746 relating to unsworn falsification to authorities.

Dated: January 8, 2024

_____
Robert Arnold

PD.44165668.1